22-2101-bk(L), 23-965(L)*

# United States Court of Appeals

*for the*

# Second Circuit

IN RE: FAIRFIELD SENTRY LTD.,

*Debtor.*

On Appeal from the United States District Court
for the Southern District of New York

## PLAINTIFFS/APPELLANTS/CROSS-APPELLEES'
## PETITION FOR REHEARING AND REHEARING EN BANC

DAVID J. MOLTON
MAREK P. KRZYZOWSKI
BROWN RUDNICK LLP
Seven Times Square
New York, New York 10036
(212) 209-4800

PAUL D. CLEMENT
MATTHEW D. ROWEN
CLEMENT & MURPHY, PLLC
706 Duke Street
Alexandria, Virginia 22314
(202) 742-8900

*Attorneys for Plaintiffs/Appellants/Cross-Appellees*

September 18, 2025

---

\* The list of consolidated appeals may be found at Docket No. 22-2101, Order of November 23, 2022, Exhibit A, ECF No. 30; and at Docket No. 23-965, Order of August 3, 2023, Exhibit B, ECF No. 192, and Order of August 28, 2023, ECF No. 295. Parties that have withdrawn from the appeal by letter or stipulation are listed in Docket Nos. 22-2101 and 23-965.

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, Kenneth M. Krys and Greig Mitchell, in their capacities as liquidators and foreign representatives of Fairfield Sentry Limited (In Liquidation), Fairfield Sigma Limited (In Liquidation), and Fairfield Lambda Limited (in Liquidation) (together, the "Funds"), hereby state that none of the Funds has a parent corporation and there is no publicly held corporation owning ten percent (10%) or more of the shares of any of the Funds.

**TABLE OF CONTENTS**

CORPORATE DISCLOSURE STATEMENT..............................................i

TABLE OF AUTHORITIES.....................................................................iii

RULE 40(b) STATEMENT.......................................................................1

QUESTIONS PRESENTED.......................................................................2

BACKGROUND........................................................................................2

    A.    Legal Background .................................................................2

    B.    Factual Background...............................................................5

    C.    Procedural History ...............................................................7

REASONS FOR GRANTING THE PETITION .....................................10

I.    The Panel's Holding That The Bankruptcy Code Safe Harbor Applies Extraterritorially Is Inconsistent With Supreme Court Precedent...................................................................................10

II.    The Panel's Holding That The Liquidators' Claims Do Not Fall Within §548(a)(1)(A)'s Exception To The Safe Harbor Is Likewise Inconsistent With Binding Precedent. ...........................15

    A.    The Panel Overlooked Circuit Precedent Holding That Allegations Creating "a Strong Inference of Fraudulent Intent" Will Survive a Motion to Dismiss. ............................15

    B.    The Panel Further Erred in Reversing the Bankruptcy Court, *Sua Sponte*, on Whether Citco's Conduct Is Imputed to the Funds. .........................................................19

CONCLUSION .......................................................................................21

CERTIFICATE OF COMPLIANCE  WITH TYPE-VOLUME LIMITATION

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

## Cases

*Abitron Austria GmbH v. Hetronic Int'l, Inc.,*
600 U.S. 412 (2023) ................................................................. 1, 10, 12

*Glob.-Tech Appliances, Inc. v. SEB S.A.,*
563 U.S. 754 (2011) .............................................................. 18

*In re Atlas Shipping A/S,*
404 B.R. 726 (Bankr. S.D.N.Y. 2009) ................................... 4

*In re CIL Ltd.,*
582 B.R. 46 (Bankr. S.D.N.Y. 2018) ................................. 2, 11

*In re Condor Ins. Ltd.,*
601 F.3d 319 (5th Cir. 2010) .......................................... 4, 14

*In re Fairfield Sentry Ltd.,*
596 B.R. 275 (Bankr. S.D.N.Y. 2018) ................................. 19

*In re Fairfield Sentry Ltd.,*
630 F.Supp.3d 463 (S.D.N.Y. 2022) .................................... 19

*In re Kaiser,*
722 F.2d 1574 (2d Cir. 1983) ............................................. 15

*In re Koreag, Controle et Revision S.A.,*
961 F.2d 341 (2d Cir. 1992) ................................................ 4

*In re Lyondell Chem. Co.,*
554 B.R. 635 (S.D.N.Y. 2016) ....................................... 15, 20

*In re Metzeler,*
78 B.R. 674 (Bankr. S.D.N.Y. 1987) ................................... 4

*In re TransCare Corp.,*
81 F.4th 37 (2d Cir. 2023) ................................................. 17

*In re Trib. Co. Fraudulent Conv. Litig.,*
10 F.4th 147 (2d Cir. 2021) ............................................... 15

*Merit Mgmt. Grp., LP v. FTI Consulting, Inc.,*
  583 U.S. 366 (2018) ...................................................................... 3, 9

*Rimini St., Inc. v. Oracle USA, Inc.,*
  586 U.S. 334 (2019) ........................................................................ 12

*RJR Nabisco v. European Cmty.,*
  579 U.S. 325 (2016) ........................................................................ 10

*United States v. Sineneng-Smith,*
  590 U.S. 371 (2020) ........................................................................ 19

*United States v. Svoboda,*
  347 F.3d 471 (2d Cir. 2003) ........................................................... 18

**Statutes**

11 U.S.C. §103(a) ............................................................................ 11

11 U.S.C. §544 .................................................................................. 2

11 U.S.C. §545 .................................................................................. 2

11 U.S.C. §546(e) ..................................................................... *passim*

11 U.S.C. §547 .................................................................................. 2

11 U.S.C. §548 ........................................................................... 2, 15

11 U.S.C. §548(a)(1) ................................................................. *passim*

11 U.S.C. §561(d) ..................................................................... *passim*

11 U.S.C. §1104 .............................................................................. 11

11 U.S.C. §1501 .............................................................................. 14

11 U.S.C. §1507 ................................................................................ 4

11 U.S.C. §1507(d) ......................................................................... 14

11 U.S.C. §1508 .............................................................................. 14

11 U.S.C. §1509(b) ................................................................. 3

11 U.S.C. §1509(b)(3) ............................................................ 14

11 U.S.C. §1511(a) ................................................................ 5

11 U.S.C. §1512 ..................................................................... 5

11 U.S.C. §1521(a) ................................................................ 3

11 U.S.C. §1523 ..................................................................... 5

11 U.S.C. §1523(a) ............................................................ 5, 13

## RULE 40(b) STATEMENT

The Supreme Court has repeatedly emphasized that domestic statutes cover only domestic conduct, absent "'a clear, affirmative indication' that they apply extraterritorially." *Abitron Austria GmbH v. Hetronic Int'l, Inc.*, 600 U.S. 412, 419 (2023). The panel decision defies this "longstanding principle of American law," *id.* at 417, holding that the Bankruptcy Code bars foreign liquidators from undoing foreign transactions under foreign law, even though the relevant Code provisions contain no express statement of extraterritorial application and the whole point of Chapter 15 is to facilitate—not hinder—foreign liquidators. The panel also departed from longstanding circuit precedent in holding that the Liquidators' allegations did not come within the Code's allowance for unwinding intentional fraudulent transfers. The net result of these twin errors leaves foreign liquidators in U.S. courts uniquely disabled—effectively barred from recouping funds they could recover in foreign courts—rendering them worse off not only than domestic trustees, but than they would be without Chapter 15. The panel decision thus conflicts with precedent and defeats Congress' intent by turning Chapter 15 upside down. The Court should grant rehearing.

## QUESTIONS PRESENTED

1. Whether the Bankruptcy Code's safe harbor for securities settlement payments, 11 U.S.C. §546(e), applies extraterritorially.

2. Whether the Liquidators plausibly alleged that their foreign-law claims fall into the exception to the safe harbor, 11 U.S.C. §548(a)(1)(A), which covers claims targeting transfers made "with actual intent to … defraud" creditors.

## BACKGROUND

### A. Legal Background

1. Chapters 7 and 11 of the Bankruptcy Code govern bankruptcies of U.S. companies under U.S. law. A "trustee" oversees such bankruptcies and is authorized to bring an adversary proceeding to "avoid" (i.e., undo) certain transactions the insolvent company previously executed. *See* 11 U.S.C. §§544, 545, 547, 548. The trustee's avoidance powers extend only to domestic transfers. *In re CIL Ltd.*, 582 B.R. 46, 69, 83-93 (Bankr. S.D.N.Y. 2018).

The Bankruptcy Code creates a carveout, or "safe harbor," for particular kinds of domestic transactions that the trustee can*not* avoid. As relevant here, a trustee may not avoid a financial institution's transfers "in connection with a securities contract." 11 U.S.C. §546(e).

The Code thus "creates both a system for avoiding transfers and a safe harbor from avoidance—logically these are two sides of the same coin." *Merit Mgmt. Grp., LP v. FTI Consulting, Inc.*, 583 U.S. 366, 381 (2018).

Adding an additional wrinkle, the Code creates an exception to §546(e)'s safe harbor (i.e., an exception to the exception) for transfers made "with actual intent to hinder, delay, or defraud" creditors. 11 U.S.C. §548(a)(1)(A). So, while a domestic trustee generally may not undo settled securities transactions involving covered entities, *id.* §546(e), the trustee may undo such transactions if they were made with fraudulent intent, *see id.* §548(a)(1)(A).

2. While Chapters 7 and 11 govern domestic bankruptcy proceedings, Chapter 15 authorizes "foreign representatives" (a.k.a. liquidators) to enlist the aid of U.S. courts in administering foreign bankruptcies. *See* 11 U.S.C. §§1509-1515. Once a U.S. court recognizes a foreign insolvency proceeding under Chapter 15, the foreign representative may initiate adversary proceedings and "apply directly" to the U.S. court "for appropriate relief." *Id.* §1509(b). The court "may" then "grant any appropriate relief," *id.* §1521(a), "consistent with the principles of comity," if, among other things, it "will reasonably assure"

3

"just treatment of all holders of claims" and "prevention of preferential or fraudulent dispositions of property of the debtor," *id.* §1507.

Chapter 15 also grants foreign representatives significant power to bring "avoidance" claims in U.S. court. Unlike Chapters 7 and 11, which authorize domestic trustees to "avoid" only domestic transactions under U.S. law, *see In re Atlas Shipping A/S*, 404 B.R. 726, 744 n.16 (Bankr. S.D.N.Y. 2009), Chapter 15 authorizes foreign representatives to bring avoidance claims in the United States that arise under foreign law and/or involve foreign transactions, *In re Condor Ins. Ltd.*, 601 F.3d 319, 329 (5th Cir. 2010). In fact, foreign representatives possessed the power to bring avoidance claims under foreign law even before the enactment of Chapter 15, *see In re Metzeler*, 78 B.R. 674, 677 (Bankr. S.D.N.Y. 1987), and that power was not limited by the safe harbor provision applicable to domestic avoidance claims under Chapters 7 and 11, *see In re Koreag, Controle et Revision S.A.*, 961 F.2d 341, 357 (2d Cir. 1992).

In addition to carrying forward the foreign representative's power to bring avoidance claims arising under foreign law, Chapter 15 grants foreign representatives a new power to bring avoidance claims under domestic law in certain circumstances. Specifically, Chapter 15 allows

foreign representatives to initiate or participate as a party-in-interest in domestic bankruptcy proceedings under Chapters 7 and 11, *see* 11 U.S.C. §§1511(a), 1512—and, when a foreign representative does so, §1523 vests the foreign representative with the avoidance powers of a domestic trustee, *id.* §1523(a). In other words, if a foreign representative, acting under the authority of Chapter 15, initiates or intervenes in a Chapter 7 or 11 proceeding, it can bring claims arising under domestic law to undo various *domestic* transfers, just like a domestic trustee. To ensure equal treatment of trustees and foreign representatives, however, the Bankruptcy Code elsewhere provides that all Code provisions "relating to securities contracts"—including the §546(e) safe harbor—"shall apply in a case under chapter 15 … to limit avoidance powers to the same extent as in a proceeding under chapter 7 or 11 of this title." *Id.* §561(d).

## B. Factual Background

For decades, Bernie Madoff ran the largest Ponzi scheme in history. Through Bernard L. Madoff Investment Securities ("BLMIS"), Madoff raised billions of dollars from investors. But instead of investing it, Madoff put the money in a bank account and then falsified trading records to create the illusion of large returns. When investors sought to

redeem their investments, BLMIS paid out their paper gains using money raised from other investors.  In 2008, the scheme collapsed.

The debtors in this case were investment funds (collectively, the "Funds") based in the British Virgin Islands ("BVI") that invested heavily in BLMIS.  Op.3.  Investors purchased shares in the Funds and could redeem them at any time for cash at a price equal to the then-current Net Asset Value per share ("NAV").  Op.5.  The Funds' directors delegated the task of certifying and calculating the NAV to Citco Group Limited and its affiliates (collectively, "Citco"), which served as the Funds' administrators and as custodians of their assets.  JA4634-36 (Compl.¶¶45, 49).

As early as 2000, Citco was suspicious of Madoff and concerned about the Funds' investments in BLMIS.  One executive stated that Citco was in a "dangerous situation" because it did "not seem to have an independent source to verify the information from BLMIS."  JA4636 (Compl.¶50).  He subsequently warned that Citco faced potential "exposure of more than USD3 billion" because he did "not see evidence that [Madoff's] portfolio exist[ed]."  JA4637 (Compl.¶53).  But after trying and failing three times to verify the existence of the Funds' assets,

JA4637-40 (Compl.¶¶52-61), Citco simply stopped trying, and Citco's upper management told the executives to drop the issue. *See* JA4637-38, JA4640 (Compl.¶¶52-55, 61).

Despite possessing abundant evidence of Madoff's fraud, Citco continued to determine and certify NAVs based on BLMIS's stated investment returns and to redeem shares in the Funds based on those falsely inflated valuations. JA4636-38 (Compl.¶¶50-55). Indeed, far from resigning as Administrator, and notwithstanding its duties to the Funds, Citco quietly ended its own credit relationships with the Funds due to evidence of Madoff's fraud. JA4640-41 (Compl.¶¶64-65). In 2006, moreover, Citco negotiated an 800% increase in its custodian fees as a condition of continuing to do business with the Funds, by charging a percentage of the inflated NAVs that Citco itself certified. JA4641-42 (Compl.¶¶67-68). Citco thus enabled the Funds to continue operating— and enriched itself from Madoff's fraud—without ever sharing what it knew with investors.

## C. Procedural History

1. After Madoff's Ponzi scheme collapsed, the Funds entered liquidation proceedings under BVI law. The Liquidators were tasked

with recovering and distributing assets for innocent investors. One potential source of recovery was investors who had redeemed their shares before Madoff's scheme was revealed, thereby recouping not just their principal but also falsely inflated returns paid for by their fellow investors, who stood to receive nothing.

After filing one set of lawsuits in BVI courts, the Liquidators commenced related proceedings in the United States. The bankruptcy court recognized the BVI litigation as a "foreign main proceeding" under Chapter 15, and the Liquidators proceeded with the present litigation, which seeks the return of more than $6 billion under various BVI statutory and common-law causes of action. In a series of decisions, the bankruptcy court dismissed all the Liquidators' claims, except for constructive trust claims against the few Defendants that allegedly knew of Madoff's fraud when they redeemed their shares. Op.10-12. The district court affirmed, albeit on somewhat different grounds. Op.12.

2. The parties cross-appealed, and a panel of this Court ruled for Defendants, reversing the ruling that the constructive trust claims could proceed and affirming the dismissal of all other claims.

8

After concluding that all Defendants were subject to the court's personal jurisdiction, the panel held that "the safe harbor of §546(e) applies extraterritorially through §561(d)." Op.33; *see* Op.21-32. Although §561(d) contains no express statement that §546(e)'s limitation on avoiding powers applies to acts (transfers) that take place outside U.S. territory, the panel held that §561(d) "must apply extraterritorially if it is to have any effect at all." Op.24. The panel thus concluded that §546(e) blocks foreign representatives from avoiding foreign transactions under foreign law in Chapter 15 proceedings, even if they could avoid those same transactions in the "foreign main proceeding" recognized under Chapter 15.[1]

The panel next assessed whether the safe harbor bars the Liquidators' claims. The panel "agree[d] with the liquidators that a foreign-law claim need not include fraud as an element" to fall within §548(a)(1)(A)'s "carve-out" for claims targeting "intentional fraudulent transfer[s]." Op.34. But it held that the Liquidators failed to plausibly

---

[1] The panel also employed the novel theory that §546(e) applies directly (without implied preemption) to claims beyond those invoking the substantive avoidance powers granted in Chapter 5. *But see Merit Mgmt.*, 583 U.S. at 381.

9

allege that Citco *intended* to defraud the Funds' future creditors when it issued redemption payments to Defendants based on fraudulent NAVs, concluding that Citco was at most "*reckless* with respect to the risk of fraud at BLMIS." Op.35 (emphasis added). The panel further held that even though Citco acted as the Funds' agent when transferring those payments, Citco's intent was not "attributable to the Funds." Op.39.

## REASONS FOR GRANTING THE PETITION

**I.  The Panel's Holding That The Bankruptcy Code Safe Harbor Applies Extraterritorially Is Inconsistent With Supreme Court Precedent.**

It is black-letter law that federal statutes do not apply extraterritorially unless "'Congress has affirmatively and unmistakably instructed that' the provision at issue should 'apply to foreign conduct.'" *Abitron*, 600 U.S. at 417-18 (quoting *RJR Nabisco v. European Cmty.*, 579 U.S. 325, 335 (2016)). That basic principle should have controlled here, as the Bankruptcy Code contains no indication—let alone an affirmative and unmistakable one—that §546(e)'s "safe harbor," which prevents domestic trustees from undoing certain domestic transactions under domestic law, applies when a *foreign* representative targets *foreign* transfers under Chapter 15, asserting *foreign*-law claims against defendants properly sued in U.S. courts.

10

By its terms, §546(e) applies only to conduct that occurs within the United States. It is located in Chapter 5 of the Bankruptcy Code, which applies only in domestic bankruptcy proceedings. *See* 11 U.S.C. §103(a). It expressly applies to a "trustee," which is a defined term for the representative of a domestic debtor's estate in a domestic proceeding. *See id.* §§701-04, 1104. And it curtails only the domestic trustee's assertion of domestic avoidance powers (conferred elsewhere in Chapter 5) to target domestic transfers, for the simple reason that trustees lack authority to avoid foreign transfers. *See, e.g.*, *In re CIL Ltd.*, 582 B.R. at 83-93.

Section 561(d) similarly contains no mention of "foreign" or "extraterritorial" application, or of any reach "beyond the United States." It merely says that §546(e) "shall apply in a case under chapter 15," i.e., a case involving a foreign bankruptcy, "to limit avoidance powers to *the same extent* as in a proceeding under chapter 7 or 11." 11 U.S.C. §561(d) (emphasis added). As just explained, §546(e) limits a trustee's ability to wield domestic avoidance powers and target domestic transfers.

Accordingly, by extending the safe harbor to Chapter 15 proceedings, §561(d) limits a foreign representative's ability to wield

domestic avoidance powers and target domestic transfers, but does not limit a foreign liquidator's foreign-law avoidance powers. Extending §546(e)'s safe harbor in Chapter 15 proceedings to foreign transfers (especially intentionally fraudulent ones) would both project the statute extraterritorially and apply the safe harbor to a considerably *greater* extent in Chapter 15 proceedings than in domestic proceedings—not "to the same extent," as §561(d) commands.

The panel's contrary decision flouts the Supreme Court's repeated admonitions that the presumption against extraterritoriality can be overcome only by an "affirmative[] and "unmistakeabl[e]" statutory directive. *See, e.g.*, *Abitron*, 600 U.S. at 417. The panel's analysis hinged almost entirely on the canon against surplusage; it asserted that §561(d) "must apply extraterritorially if it is to have any effect at all." Op.24. But the panel's need to resort to that relatively weak canon of construction, *see Rimini St., Inc. v. Oracle USA, Inc.*, 586 U.S. 334, 346 (2019), just underscores that the text is bereft of any "clear, affirmative indication" that the safe harbor covers transfers that occur entirely outside the United States and would otherwise be avoidable under foreign law. *Abitron*, 600 U.S. at 419.

12

At any rate, the predicate for the panel's ruling is incorrect. Section 561(d) is not superfluous, as it limits foreign representatives' power with respect to conduct occurring *within* the United States in at least two ways. First, it ensures that when a foreign representative participates in a domestic bankruptcy pursuant to §1523(a), its use of domestic avoidance powers and targeting of domestic transfers is subject to §546(e)'s safe harbor. The panel resisted this conclusion on the ground that a domestic bankruptcy is always "a separate case from the Chapter 15 proceeding." Op.26-27. But without §561(d), the safe harbor covers only a "trustee"—not a foreign representative at all. That alone suffices to defeat a superfluity finding.

But even leaving §1523(a) to one side, §561(d) could be given further domestic effect by reading it to shield *domestic* transfers that foreign representatives seek to avoid under foreign sources of law, without also shielding *foreign* transfers from avoidance. The panel rejected this reading by asserting that domestic law "[g]enerally" applies to domestic transfers. Op.28. But that is far from a categorical rule. This case illustrates as much: The Liquidators are targeting "at least some" foreign-to-domestic transfers; the parties *agree* that BVI law applies; and

13

Defendants themselves have argued that blocking claims involving these transfers would be a *domestic* application of the safe harbor rather than an extraterritorial one. *See* Defendants-Appellees'Br., No.22-2101, Dkt.661 at 26 n.11; *see also In re Condor*, 610 F.3d at 320 (holding that Chapter 15 authorizes courts to apply foreign law to foreign-to-domestic transfers). So, by Defendants' own account, §561(d) *can* be given effect without construing it to apply to conduct occurring abroad.

Finally, the panel erred in positing that "[t]he problem that Congress sought to address when it enacted §561(d) required an extraterritorial application." Op.31. According to the panel, Congress intended §561(d) to protect investors from "the risk of avoidance litigation brought by the bankruptcy estates of failed foreign companies." Op.31-32. Of course, such speculation about what Congress sought to accomplish is the antithesis of the kind of clear, affirmative statement required for extraterritorial application. Moreover, there was no need to speculate, as the *text* of Chapter 15 indicates Congress' purpose—namely, to facilitate foreign insolvency proceedings, consistent with principles of comity and international cooperation. 11 U.S.C. §1508; *see id.* §§1501, 1507(d), 1509(b)(3). The panel's strained effort to limit foreign

14

representatives' ability to use foreign avoidance powers available to them in their home jurisdictions does the opposite.

## II. The Panel's Holding That The Liquidators' Claims Do Not Fall Within §548(a)(1)(A)'s Exception To The Safe Harbor Is Likewise Inconsistent With Binding Precedent.

Even assuming *arguendo* that §546(e)'s safe harbor applied extraterritorially through §561(d), the Liquidators' claims should be allowed to proceed because they fall within §548(a)(1)(A)'s exception for intentional fraudulent transfers.

### A. The Panel Overlooked Circuit Precedent Holding That Allegations Creating "a Strong Inference of Fraudulent Intent" Will Survive a Motion to Dismiss.

Because "[f]raudulent intent is rarely susceptible to direct proof," this Court has long held that "actual intent to defraud" may be "inferred" from the circumstances. *In re Kaiser*, 722 F.2d 1574, 1582 (2d Cir. 1983). Accordingly, at the pleading stage, a litigant invoking §548(a)(1)(A) need only allege facts that raise "a strong inference of fraudulent intent." *In re Trib. Co. Fraudulent Conv. Litig.*, 10 F.4th 147, 171 (2d Cir. 2021); *see also, e.g.*, *In re Lyondell Chem. Co.*, 554 B.R. 635, 652 (S.D.N.Y. 2016). In *Tribune Co.*, for example, this Court held that a bankruptcy trustee's allegations that the debtor had paid an unusually high fee to a relatively unknown firm in exchange for a solvency opinion that relied on a

definition of "fair value" that was "inconsistent[] with the industry standard" gave rise to the requisite inference that the payment was made with fraudulent intent.  10 F.4th at 171-72.

Here, the Liquidators raised *at least* as strong of an inference that Citco acted with fraudulent intent by knowingly certifying fraudulent NAVs.  The operative complaint is replete with allegations that Citco harbored serious doubts about whether the Funds' assets with BLMIS even existed nearly a decade before the Madoff Ponzi scheme was made public.  As early as 2000, Citco executives were warned that Madoff could be a repeat of the notorious Manhattan Investment Fund fraud from the early 1990s—"multiplied by a factor of five."  JA4636 (Compl.¶50).  Between May 2000 and December 2002, Citco repeatedly tried—and failed—to obtain evidence from Madoff that the Funds' assets existed.  JA4638-40 (Compl.¶¶57-61).  Citco knew that "BLMIS's transactions were likely impossible"; "on numerous occasions … the trades reported by BLMIS contradicted the public daily price ranges for corresponding trades"; and the BLMIS account statements that Citco used to calculate NAVs "contained incorrect information."  JA4642 (Compl.¶¶70-71).  By 2006, Citco stopped demanding documentation for NAVs it strongly

16

suspected were fabricated and instead opted to tie its own fees to those inflated NAVs, thus increasing those fees "by 800%." JA4641-42 (Compl.¶¶67-68).

All of that is compelling evidence that Citco knew it was certifying fraudulently inflated redemption payments, thus intentionally defrauding the Funds' future creditors. Indeed, Defendants all but conceded the point. *See* Defendants-Appellees'Br., No.22-2101, Dkt.661 at 43-44. Yet the panel struck out on its own to hold that the Liquidators failed to adequately allege Citco's fraudulent intent. Op.35-37. According to the panel, the Liquidators' allegations do not "show that Citco was 'substantially certain' that BLMIS was a Ponzi scheme and that investors who redeemed shares late would be defrauded." Op.36.

That holding is impossible to square with the well-established principle that "actual intent to … defraud" may be—and usually is—inferred from circumstantial evidence, including the "unusualness of the transaction" and "concealment of facts … by the transferor." *In re TransCare Corp.*, 81 F.4th 37, 54 (2d Cir. 2023). To be sure, the cases applying that principle generally arise in the domestic context. But the notion that domestic trustees get the benefit of the doubt when pleading

17

fraudulent intent, but foreign liquidators do not, is fundamentally antithetical to Chapter 15. Given the Liquidators' allegations that Citco used dishonest NAV calculations over several years, demanded (and secured) a massive increase in fees for continuing to do business with the Funds, and never shared with investors its fears that the underlying assets did not exist, the Liquidators alleged more than enough circumstantial evidence to proceed.

Moreover—and perhaps because it did not receive adversarial briefing on this issue—the panel overlooked binding precedent holding "that willful blindness is as culpable as actual knowledge." *Glob.-Tech Appliances, Inc. v. SEB S.A.*, 563 U.S. 754, 766 (2011) (brackets omitted). The Liquidators unquestionably alleged that Citco was "aware of a high probability" that BLMIS was engaged in fraud but, after December 2002, "consciously avoided learning that fact." *United States v. Svoboda*, 347 F.3d 471, 477 (2d Cir. 2003). Those allegations "permit[] a finding of knowledge" that the NAVs were inaccurate, *id.* at 477-78—which, by the panel's own account, would mean that Citco had the requisite fraudulent intent when it nevertheless continued to certify those NAVs, to the detriment of the Funds' future creditors. *See* Op.36-37.

**B.    The Panel Further Erred in Reversing the Bankruptcy Court, *Sua Sponte*, on Whether Citco's Conduct Is Imputed to the Funds.**

The panel compounded its error by concluding that even if Citco acted with intent to defraud, its intent was not attributable to the Funds. Op.39-42.  Relying on expert testimony from both sides, the bankruptcy court concluded that "Citco's knowledge and conduct w[as] imputed to its principal, i.e., the Funds," under BVI-law principles of agency.  *In re Fairfield Sentry Ltd.*, 596 B.R. 275, 299, 306 (Bankr. S.D.N.Y. 2018).  The district court acknowledged this holding and assumed (without deciding) that it was correct.  *In re Fairfield Sentry Ltd.*, 630 F.Supp.3d 463, 494, 498-99 (S.D.N.Y. 2022).  And by the time the case was appealed to this Court, there was no longer any "dispute that the Citco Administrator's fraudulent intent is attributable to the Funds."  Plaintiffs-Appellants'Br., No.22-2101, Dkt.227 at 75.  To be clear:  Defendants admitted on appeal that "Citco Fund Services' alleged bad faith is attributed to the Funds." Defendants-Appellees'Br., No.22-2101, Dkt.661 at 58-59.

Yet the panel reversed anyway, *sua sponte*.  That holding was not only procedurally improper, *see United States v. Sineneng-Smith*, 590 U.S. 371, 375 (2020) (directing courts to "follow the principle of party

presentation"), but substantively erroneous. The panel began its analysis with two paragraphs on New York law of agency. But New York law is irrelevant: The parties agreed that *BVI law* governs whether Citco's actions are imputed to the Funds; the bankruptcy court so held after considering competing experts on BVI law; and even the panel ultimately seemed to recognize as much, *see* Op.41 (citing *In re Lyondell*, 554 B.R. at 647).

When the panel finally turned to BVI law, it badly misstated it. *Contra* Op.41, the Privy Council's decision in *Weavering II* did not "state[] that even if the issue of Citco's bad faith had been raised in *Migani*, the NAVs nonetheless would have been binding on the Funds because the alleged fraud was 'external to the fund.'" The Privy Council instead distinguished *Migani*—which was issued before Citco's misconduct came to light—on the ground that *Madoff's* fraud (in and through BLMIS) was external to the Funds. SPA.428-29 (¶¶23-24). Given the allegations regarding Citco, this case is governed by *Weavering II*, which concluded that NAVs were *not* binding on the Funds because the individual "who had the authority to calculate and to certify the NAVs[] did so 'on a fraudulent basis.'" Op.41 n.12 (quoting SPA.429 (¶26)).

20

In sum, the panel rejected the Liquidators' §548(a)(1)(A) argument on grounds that were effectively undisputed, overstepping the judicial role and flouting this Court's precedents on the standard for proving fraudulent intent. Those errors should not be permitted to stand.

## CONCLUSION

This Court should grant rehearing.

Dated: September 18, 2025        Respectfully submitted,

<div style="display:flex; justify-content:space-between;">

<div>

s/ Paul D. Clement

</div>
</div>

DAVID J. MOLTON                    PAUL D. CLEMENT
MAREK P. KRZYZOWSKI               MATTHEW D. ROWEN
BROWN RUDNICK LLP                  CLEMENT & MURPHY, PLLC
Seven Times Square                 706 Duke Street
New York, New York 10036           Alexandria, Virginia 22314
(212) 209-4800                     (202) 742-8900

*Attorneys for Plaintiffs/Appellants/Cross-Appellees*

## CERTIFICATE OF COMPLIANCE
## WITH TYPE-VOLUME LIMITATION

I hereby certify that:

1. This brief complies with the type-volume limitation of Local R. 32.1(a)(4)(A) because it contains 3,899 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f), as determined by the word counting feature of Microsoft Word 2016.

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the typestyle requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in 14-point font.

September 18, 2025

<div style="text-align:right">

s/Paul D. Clement
Paul D. Clement

</div>

## CERTIFICATE OF SERVICE

I hereby certify that, on September 18, 2025, an electronic copy of the foregoing was filed with the Clerk of Court using the ECF system and thereby served upon all counsel appearing in this case.

s/Paul D. Clement
Paul D. Clement